J-A31041-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.R.J.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1664 EDA 2017 |

Appeal from the Order Entered May 2, 2017
in the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0001013-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: J.M.C.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: T.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1666 EDA 2017 |

Appeal from the Order Entered May 2, 2017
in the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-AP-0001014-2016

BEFORE:   PANELLA, J., OLSON, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED OCTOBER 25, 2018**

Appellant, T.T. ("Mother"), files this appeal from the orders entered May 2, 2017, in the Philadelphia County Court of Common Pleas, granting the petitions of the Philadelphia Department of Human Services ("DHS") and involuntarily terminating her parental rights to her minor male children,

---

* Former Justice specially assigned to the Superior Court.

L.R.J.P., born in August of 2007, and J.M.C.P., born in December of 2011, (collectively, the "Children") pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).[1] After review, we vacate the orders involuntarily terminating Mother's parental rights to the Children without prejudice and remand for proceedings consistent with this memorandum.

The trial court summarized the relevant procedural and factual history, in part, as follows:

> The family in this case became known to DHS on June 8, 2014, when DHS received a Child Protective Services ("CPS") report which alleged that the Children's then sixteen-year-old brother ("Sibling 1") forced his sister ("Sibling 2") and her friend to perform oral sex on him. . .Mother states she never saw any signs that Sibling 1 had sexually abused Sibling 2. . . . .The Children, at the time, were living in a home with Mother, [Father], Sibling 2, and two brothers ("Sibling 3" and "Sibling 4"). Mother admitted to having a learning disability and that she was the primary caretaker for the children. In July 2014, Sibling 2 reported sexual abuse and inappropriate touching from Sibling 3 and Sibling 4. DHS obtained an [Order of Protective Custody ("OPC")] for Sibling 2, after which she was adjudicated dependent, and she was placed in a foster home through [Asociación Puertorriqueños en Marcha ("APM")], where she currently remains. Mother was referred to the CEU for monitoring, and a forthwith drug screen, as well as to Behavioral Health Systems ("BHS") for a consultation and evaluation. Mother was also referred for a parenting capacity evaluation ("PCE"). In August 2014, Mother reported that she was diagnosed with depression two years before, but did not take any medication. Mother has a history of using marijuana. In January 2015, DHS received a General Protective Services ("GPS") report

---

[1] By separate orders entered the same date, the trial court involuntarily terminated the parental rights of B.P. ("Father") with respect to the Children. The court additionally involuntarily terminated the parental rights of any unknown father as to L.R.J.P. Father filed appeals, which this Court consolidated and addressed in a separate memorandum.

alleging that the Children's sibling ("Sibling 5") disclosed that the [f]ather was physically abusive to Mother; that Father last abused Mother in August 2014 and Sibling 5 intervened; that Father attacked Sibling 5 when he intervened; that Father had a history of hitting the Children and their siblings; and that Sibling 5 lives with his father and spends weekends at Mother and Father's home. The report was substantiated.

On November 5, 2015, DHS visited Mother and Father's home and learned that there was no gas service in the home; that the refrigerator did not function properly; that the home was dirty; and that there was insufficient food in the home. On December 11, 2015, Mother's Clinical Evaluation Unit ("CEU") drug screen showed traces of cocaine and her creatinine level was 40mg/d1. On December 18, 2015, DHS filed urgent dependency petitions for the Children, Sibling 3, and Sibling 4. On December 24, 2015, the Children were adjudicated dependent. The court ordered DHS to supervise, but cautioned parents that the children would be placed if parents did not comply with all of the court's orders. The court ordered [Community Umbrella Agency ("CUA")] to assist with a house cleaning service and exterminator for the family; to provide beds and bedding for the family; to order a refrigerator; to conduct pop-up visits; parents to comply with safety plans and all social workers. The court also ordered Mother to continue her dual diagnosis program at Chances;. . .and Mother. . .to be referred to the CEU for forthwith drug screens, assessments, and random screens.

At a review hearing on March 22, 2016, CUA testified that the home had been exterminated and cleaned and that the new bunk bed and refrigerator were provided. The court found that the Children, Sibling 3, and Sibling 4 were not safe in Mother and Father's care, discharged supervision, and ordered all four children to be committed to DHS. Mother and Father were granted weekly supervised visits. On June 9, 2016, at an emergency hearing, CUA testified that Mother reportedly picked up [L.R.J.P.'s] attention deficit hyperactive disorder ("ADHD") medication from the pharmacy and sold it for money. When confronted by CUA, Mother admitted to selling the medication because she needed money. CUA also testified that Mother brought her sister ("Maternal Aunt") to a therapy session with the Children and Maternal Aunt threatened the Children's foster parent. Following phone calls with Mother. . .,the Children's negative behaviors would increase. . . .The court ordered all visitation to be supervised at the agency, line of sight and line of

hearing. The court also ordered no more phone calls between the parents and the Children until further order of the court, and Mother and Father were ordered not to contact the foster parents directly. Mother was ordered not to attend any further therapy appointments for the Children until recommended by their therapists, and to go to the CEU for a forthwith drug screen and three random screens.

On July 1, 2016, at a permanency review hearing, the court found Mother. . .to be minimally compliant with [her] SCP objectives. The court ordered Mother to be re-referred to the CEU for a forthwith drug screen, dual diagnosis assessment, and three random screens; to sign necessary consents and releases; to be re-referred for parenting classes; and to be granted her line of sight and line of hearing supervised visits. . . .

On October 26, 2016, DHS filed petitions to terminate Mother's and Father's parental rights and change the permanency goal for the Children from reunification to adoption. At the time, the Children had been in care for eight months at the start of the termination trial and fourteen months at the conclusion. The Children have been active with DHS for twenty-six months.

Trial Court Opinion ("T.C.O."), 7/25/17, at 1-3.

The trial court held hearings on the petitions on November 14, 2016, February 1, 2017, February 16, 2017, March 10, 2017, and May 2, 2017.[2] In support thereof, DHS presented the testimony of the following: Dr. William Russell, a forensic psychologist who was stipulated as an expert as to parenting capacity evaluations and completed parenting capacity evaluations of both Mother and Father; Jennifer Rollins, CUA case manager supervisor, APM; and Dominique Bibbs, CUA case manager, APM. Father was present and testified on his own behalf. He additionally presented the testimony of his

_____

[2] The court convened on May 2, 2017, to announce its decision with respect to DHS' petitions.

mother, C.K., paternal grandmother. Mother, while present, declined to testify on her own behalf or present any evidence. Children were represented by a Child Advocate, Shannon Parker, Esquire, who presented the testimony of Jessica Spurgeon, child advocate social worker.[3]

Following the hearing, on May 2, 2017, the trial court entered orders involuntarily terminating the parental rights of Mother pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b), and orders changing the Children's permanency goal to adoption. On May 31, 2017, Mother, through appointed counsel, filed notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). Mother filed amended concise statements of errors complained on appeal on June 1, 2017. This Court consolidated Mother's appeals *sua sponte* on June 28, 2017.[4]

_____

[3] Notably, Attorney Parker's office, the Defender's Association Child Advocacy Unit, was appointed by the trial court on December 21, 2015, during the pendency of the dependency proceedings, as counsel and guardian *ad litem* to represent the Children. Such appointment was to represent the Children's interests in connection with proceedings related to abuse, dependency, termination of parental rights, adoption and/or custody. Order Appointing Counsel, 12/21/15.

[4] As Mother does not appeal the orders changing Children's permanency goal to adoption, any such claims related thereto are not preserved. Pa.R.A.P. 903(a) (a notice of appeal shall be filed within thirty days after the entry of the order from which the appeal is taken). Moreover, any such opposition would be waived as Mother failed to include this issue in the Statement of Questions Involved section of her brief and failed to present argument as to this issue in her brief. ***See Krebs v. United Refining Co.***, 893 A.2d 776,

On appeal, Mother raises the following issues for our review:

1. Whether the [t]rial [c]ourt erred in [t]erminating [Mother's] [p]arental [r]ights under 23 Pa.C.S.A. section 2511(a)(1), the evidence having been insufficient to establish Mother had evidenced a settled purpose of reli[n]quishing parental claim, or having refused or failed to perform parental duties[?]

2. Whether the evidence was sufficient to establish that [Mother] had refused or failed to perform parental duties, caused [the C]hildren to be without essential parental care, that [the] conditions having led to placement had continued to exist, or finally that any of above could not have been remedied[?]

3. Whether the [e]vidence was sufficient to establish that [t]ermination of [p]arental [r]ights would best serve the [n]eeds and [w]elfare of the [m]inor Children, under 23 Pa.C.S.[A.] section 2511(b)[?]

4. Whether the [t]rial [c]ourt erred in failing to continue the [m]atter for the purpose of appointing additional [c]ounsel as an advocate for the [Children], so that newly appointed [c]ounsel may represent the [Children's] legal interest[?]

Mother's Brief at 5.

We first address Mother's issue as to the appointment of counsel to represent Children's legal interests. Mother argues that the trial court erred in not granting her motion for separate legal-interests counsel due to evidence

---

797 (Pa.Super. 2006) (stating that a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues); *see also In re W.H.*, 25 A.3d 330, 339 n.3 (Pa.Super. 2011), *appeal denied*, 611 Pa. 643, 24 A.3d 364 (2011) (quoting *In re A.C.*, 991 A.2d 884, 897 (Pa.Super. 2010)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived."); *see also In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa.Super. 2017).

suggesting a preference of the Children contrary to termination of Mother's

parental rights.  Mother's Brief at 17.  She states,

> Nevertheless,. . .[m]otion was made (which was summarily
> rejected) to continue the matter so that [the] Children's legal
> interest may be preserved.  [Mother] would submit this was all
> the more important; due as previously mentioned, that at the
> visits the boys would always run to [Mother] in an [*sic*] excitement
> and that they desired to go home.  Thus, [Mother] would aver that
> the [t]rial [c]ourt erred in not appointing separate counsel.

*Id.*[5]

As to the appointment of counsel to represent a child in involuntary

termination proceedings, 23 Pa.C.S.A. § 2313(a) provides:

§ 2313.  Representation.

**(a)** **Child.**--The court shall appoint counsel to represent the
child in an involuntary termination proceeding when the
proceeding is being contested by one or both of the parents.
The court may appoint counsel or a guardian ad litem to
represent any child who has not reached the age of 18 years
and is subject to any other proceeding under this part
whenever it is in the best interests of the child.  No attorney
or law firm shall represent both the child and the adopting
parent or parents.

23 Pa.C.S.A. § 2313(a).

Our Supreme Court, in ***In re Adoption of L.B.M.***, 639 Pa. 428, 441-

42, 161 A.3d 172, 180 (2017) (plurality), held that Section 2313(a) requires

---

[5] While the Child Advocate raises the issue of waiver for Mother's failure to
raise the issue timely and appropriately before the lower court, Child
Advocate's Brief at 15-16, we do not find waiver.  ***In re T.S.***, --- A.3d
---, 2018 WL 4001825, at *5 (Pa. Aug. 22, 2018) ("We conclude, then, that
the failure of any party,. . ., to affirmatively request separate counsel for the
children cannot have constituted waiver.").

that counsel be appointed to represent the legal interests of any child involved in a contested involuntary termination proceeding. The court defined a child's legal interests as synonymous with his or her preferred outcome and distinct from a child's best interests, which must be determined by a court. *Id.* at 432, 174-75.

In *L.B.M.*, four justices agreed that a guardian *ad litem* who is an attorney may act as counsel pursuant to Section 2313(a) so long as the dual roles do not create a conflict between the child's best interest and legal interest. *Id.* at 447-62, 183-93. Recently, in *In re T.S.*, *supra*, our Supreme Court re-affirmed this legal principle, and in so doing, it acknowledged that this Court had on multiple occasions recognized the majority view expressed in *L.B.M. See In re T.S.*, *supra* at *6 (citing *D.L.B.*, 166 A.3d 322 (Pa.Super. 2017) and *In re Adoption of T.M.L.M.*, 184 A.3d 585, 588 (Pa.Super. 2018)).

In *T.M.L.M.*, which involved a child who was just under six years old at the time of the hearings to terminate his mother's parental rights, the child's attorney did not attempt to interview him, nor did she set forth his preferred outcome on the record. *T.M.L.M.*, 184 A.3d at 589-90. The attorney advocated solely for the child's best interests during the hearings, rather than his legal interests. *Id.* at 590. Additionally, the attorney did not file a brief on appeal, nor did she join a brief filed by another party. *Id.* Our Court

concluded that the child had been deprived of his statutory right to counsel, stating:

> At the time of the hearings, Child was just shy of six years old. While Child may not have been old enough to participate actively in [the attorney's] representation of him, it is not unlikely that Child has feelings one way or another about his mother and his permanency. Like adult clients, effective representation of a child requires, at a bare minimum, attempting to ascertain the client's position and advocating in a manner designed to effectuate that position. It may be that Child's preferred outcome in this case is synonymous with his best interests. It may be that Child wants no contact with Mother. Child may be unable to articulate a clear position or have mixed feelings about the matter. Furthermore, termination of Mother's rights may still be appropriate even if Child prefers a different outcome. However,. . .it is clear that where a court appoints an attorney ostensibly as counsel, but the attorney never attempts to ascertain the client's position directly and advocates solely for the child's best interests, the child has been deprived impermissibly of his statutory right to counsel serving his legal interests.

*Id.* Accordingly, we vacated the order terminating the mother's parental rights and remanded for appointment of legal counsel. *Id.* at 591.

In the case *sub judice*, the Children, who were nine and five years old at the time of the commencement of the termination proceedings, were represented by a Child Advocate, Shannon Parker, Esquire. Attorney Parker was appointed by the court and participated throughout the dependency proceedings and actively participated in the termination proceedings on behalf of the Children, questioning witnesses, presenting evidence, and making argument. However, we observe that nowhere in the certified record is there an indication that Attorney Parker was serving in a dual role representing the Children's best interests and legal interests. There is no indication in the

certified record that Attorney Parker met with or interviewed either child related to their preferred outcome. Further, she advocated on behalf of their best interests and argued in support of termination based on their best interests. Lastly, to the extent the record reflects the Children's legal interests, it suggests that a conflict may have existed between counsel's support of the termination petition and their preferred outcome.

Despite testimony as to the Children's comfort in their foster home and the positive relationship and bond between the Children and their foster mother and foster family, testimony also revealed a bond with Mother. N.T., 3/10/17, at 14, 17-18; N.T., 11/14/16, at 30-32. Notably, however, this was described to be more of a "friendlier" bond than a parental bond, and not a beneficial bond. N.T., 11/14/16, at 29-30, 80. Likewise, there was noted a lack of inquiry about Mother outside of visitation. *Id.* at 80. Nevertheless, Dominique Bibbs, CUA case manager, testified that the Children were excited to see Mother at visits. *Id.* at 20. Further, Ms. Bibbs confirmed that, during visitation, the Children expressed a desire to "go home."[6] *Id.* at 81. As such, she indicated that the Children would be upset if Mother's parental rights were terminated. *Id.* at 30-31. In addition, child advocate social worker, Jessica Spurgeon, testified that L.R.J.P. expressed his desire to return home to Mother and Father, although "okay" remaining in the foster home. N.T., 3/10/17, at

---

[6] According to Ms. Bibbs, "home" was not identified in relation to Mother and Father, but location. N.T., 11/14/16, at 81.

17. Moreover, she stated that, in May 2016, J.M.C.P. indicated, "I want to be where I'm supposed to be." *Id.*

Accordingly, we are constrained to vacate the orders involuntarily terminating Mother's parental rights to the Children without prejudice and remand for further proceedings. *See T.M.L.M.*, 184 A.3d at 587-91; *see also In re Adoption of M.D.Q.*, --- A.3d ---, 2018 WL 3322744 (Pa.Super. filed July 6, 2018) (vacating and remanding where the record does not indicate that counsel attempted to ascertain the children's preferences and the record does not reflect the children's legal interests); *see also In re Adoption of D.M.C.*, --- A.3d ---, 2018 WL 3341686 (Pa.Super. filed July 9, 2018) (vacating and remanding where the record was unclear in what capacity attorney had been appointed to represent children and whether attorney had ascertained children's legal interests prior to hearing).

On remand, the Family Court shall appoint separate legal-interests counsel for the Children. Such counsel must attempt to ascertain the Children's preferred outcome as to Mother by directly interviewing the Children, following their direction to the extent possible, and advocating in a manner that comports with the Children's legal interests. Counsel should discern from the Children whether they prefer adoption by their foster parents if the adoptive family does not support continued contact with Mother. If the Children are unable to express clearly their position as to Mother or direct counsel's representation to any extent, counsel shall notify the court. We

- 11 -

observe that the Children may have differing preferred outcomes as to Mother, in which case counsel shall inform the court, and the court shall appoint additional legal-interests counsel, so that each child is represented separately, and conduct further proceedings consistent with this memorandum.

Once a preferred outcome is identified, counsel shall notify the Family Court whether termination of Mother's parental rights is consistent with the Children's legal interests. If the Children's preferred outcome is consistent with the result of the prior termination proceedings, the court shall re-enter its May 2, 2017, orders as to Mother. If the preferred outcome is in conflict with the prior proceeding, the court shall conduct a new termination hearing as to Mother only to provide the Children's legal counsel an opportunity to advocate on behalf of the Children's legal interests. *See T.M.L.M.*, 184 A.3d at 591 (ordering that trial court shall conduct a new hearing only if it serves the "substantive purpose" of providing the child with the opportunity to advance his legal interests through new counsel).

Orders vacated without prejudice to permit the Family Court to re-enter the original orders if a new termination hearing is not required. Case remanded for proceedings consistent with this memorandum. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/25/18